238 P.3d 1117 (2010)
Noel PROCTOR, Petitioner,
v.
Robert "Ford" HUNTINGTON and Christina Huntington, husband and wife, and the marital community therein, Respondents.
No. 82326-0.
Supreme Court of Washington, En Banc.
Argued January 12, 2010.
Decided August 19, 2010.
Emmelyn Hart-Biberfeld, Philip Albert Talmadge, Talmadge/Fitzpatrick, Tukwila, WA, Katharine W. Mathews, Attorney at Law, Vancouver, WA, for Petitioner.
*1118 Bradley W. Andersen, Phillip Justin Haberthur, Schwabe Williamson & Wyatt, Vancouver, WA, for Respondents.
STEPHENS, J.
¶ 1 Robert and Christina Huntington unwittingly built their house, well, and garage entirely on a portion of land owned by their neighbor, Noel Proctor. Proctor did not realize that the Huntingtons were encroaching at the time, but, when he learned of the true boundary line between the properties, he sued to eject them. The trial court refused to issue an injunction forcing the Huntingtons to remove their home, instead requiring Proctor to deed them the acre underlying it and accept payment for the value of the land. Proctor asserts that this equitable remedy was impermissible under the circumstances of this case. We disagree, and we affirm the court below.

FACTS AND PROCEDURAL HISTORY
¶ 2 Dusty Moss subdivided his property in Skamania County into a 30-acre parcel, which Noel Proctor later purchased, and a 27-acre parcel, which the Huntingtons later purchased. Moss showed each of the purchasers the general property lines of the two parcels. In the summer of 1994, the Huntingtons camped in an area that they believed was their property, but in reality was on Proctor's parcel (the Disputed Area). They returned to camp there the next spring, at which time Proctor, who had acquired his land in the intervening year, came to the Huntingtons' campsite to introduce himself. Proctor did not object to the location of the campsite and did not realize it was on his property.
¶ 3 The boundary confusion arose because Moss had a surveyor, Dennis Peoples, set a pin along the northern border of Proctor's property (the 16th pin). The 16th pin was set to regulate logging activities north of the parties' parcels and was not intended to mark the northwest corner of the Huntingtons' parcel. The actual boundary lay 400 feet east of the pin. When clearing their home site, however, the Huntingtons asked Peoples to confirm the northwest corner of their property. Peoples mistakenly referred to the 16th pin as the boundary marker, suggesting that the Huntingtons' parcel extended farther than it did.[1]
¶ 4 The Huntingtons relied on this representation, meeting with Proctor at the 16th pin in the summer of 1995. Ford Huntington told Proctor that Peoples had identified the pin as the northwest corner of the Huntington parcel. Proctor did not object to or question the accuracy of this information. Over that summer and the next, the Huntingtons built their house, garage, and well in the Disputed Area. Proctor also built his own house. The Huntingtons have resided full time in their house since its completion in 1996.
¶ 5 In 2004, Proctor hired a surveyor to locate the corners of his property because he was concerned that another neighbor (not the Huntingtons) was encroaching. The surveyor discovered that the Huntingtons' house, well, garage, and yard were located entirely on Proctor's property. Upon this surprising discovery, the parties tried to work out "some kind of trade, a swap, [or] boundary line adjustment," but negotiations failed. Report of Proceedings (RP) at 773; Clerk's Papers (CP) at 404. In February 2005, Proctor sued to quiet title and eject the Huntingtons from his land. The Huntingtons counterclaimed to quiet title in themselves, asserting adverse possession and estoppel in pais.
¶ 6 The trial court concluded that both parties reasonably, though mistakenly, believed the 16th pin marked the northwest boundary of the Huntingtons' property. It denied the Huntingtons' adverse possession and estoppel claim,[2] but refused to issue a *1119 mandatory injunction ejecting them. It found that the acre of land on which the Huntingtons' home was built had a fair market value of $25,000, and moving the house elsewhere would cause considerable emotional hardship and cost at least $300,000. Citing Arnold v. Melani, 75 Wash.2d 143, 437 P.2d 908, 449 P.2d 800, 450 P.2d 815 (1968-69), the trial court concluded that the Huntingtons had acted in good faith and that requiring them to move their home and other improvements "would be oppressive ... and inequitable." CP at 406. Instead, the trial court ordered Proctor to sell the Huntingtons the acre of his property on which they built their home, in exchange for which they would pay $25,000. Neither side, the court noted, was the prevailing party under this resolution.
¶ 7 Both parties appealed. One of the areas of contention was whether the trial court had the authority to deny Proctor an injunction under Arnold.[3]See Br. of Appellant at 30-36. Proctor argued that Arnold did not apply because the Huntingtons' encroachment onto his property was not "slight." Proctor v. Huntington, 146 Wash. App. 836, 848, 192 P.3d 958 (2008). The Court of Appeals agreed that the encroachment was not slight but nevertheless affirmed the trial court's chosen remedy, concluding it was authorized by an older case. See id. at 849-50, 854, 192 P.3d 958 (discussing Peoples Sav. Bank v. Bufford, 90 Wash. 204, 155 P. 1068 (1916)). We granted review at 165 Wash.2d 1041, 205 P.3d 132 (2009).

ANALYSIS
¶ 8 Encroachment occurs when one builds a structure on another's land; it is a form of trespass. BLACK'S LAW DICTIONARY 607 (9th ed. 2009). Traditionally, a property owner had an absolute right to eject trespassers and to require them to remove encroaching structureseven if the trespassers believed in good faith that the land was theirs. See 7 Stuart M. Speiser, Charles F. Krause & Alfred W. Gans, The American Law of Torts §§ 23:9,:12, at 641, 646-47 (1990). This form of relief is a type of "property rule." See generally Guido Calabresi & A. Douglas Melamed, Property Rules, Liability Rules, and Inalienability: One View of the Cathedral, 85 Harv. L.Rev. 1089 (1972). Property rules are characterized by all-or-nothing relief afforded to the party who is deemed to have the legal right. See id. at 1105-06 (contrasting injunctive relief with an award of damages).
¶ 9 During the 19th and early 20th centuries, courts increasingly grappled with frustrating applications of common law property rules. Because of their absolute nature, the results sometimes seemed grossly inefficient or unfair. For example, a property rule might require a factory owner to tear down its factory because one wall of it encroached a few inches on another's lot. See, e.g., Pile v. Pedrick, 167 Pa. 296, 31 A. 646 (1895).
¶ 10 To mitigate harsh or unjust results, a new form of relief gradually crept into property law: the "liability rule." A liability rule is characterized by the exchange of damages for a transfer of a legal right. See Calabresi & Melamed, supra, at 1092, 1105-06. An early case that illustrates the difference between the two types of rules is Harrington v. McCarthy, 169 Mass. 492, 48 N.E. 278 (1897). The cornice of McCarthy's wooden building projected 18 inches into the space above Harrington's land. Id. at 493, 48 N.E. 278. The foundation of the building also encroached slightly, but only underground. Id. at 494, 48 N.E. 278. As to the cornice, the court required McCarthy to trim back any portion of the building encroaching on Harrington's lota remedy reflecting a property rule. Id. Because the foundation would be difficult or impossible to trim back and caused no appreciable harm, however, the court refused to require McCarthy to remove the foundation and instead left Harrington to *1120 his remedy at law (i.e., damages)a liability rule. Id. at 494-95, 48 N.E. 278. Following Harrington, courts occasionally began to substitute liability rules for trespass's traditional property rule in order to align case results with contemporary notions of justice. See, e.g., Geragosian v. Union Realty Co., 289 Mass. 104, 108-110, 193 N.E. 726 (1935) (summarizing the scenarios in which a liability rule might apply, but applying a traditional property rule).
¶ 11 This evolution of property law remedies can be seen in Washington precedent. Originally, a landowner could sue to eject a trespasser even if the trespasser had considerably improved on (or purchased improvements on) the land.[4] Gradually, liability rules began to surface in equity cases. In Hart v. City of Seattle, 45 Wash. 300, 301, 88 P. 205 (1907), the defendants obtained an injunction requiring the city to restore a street to its original, higher grade. The trial court gave the city the option of leaving the street at the lower grade, however, if it paid damages. Id. at 302-03, 88 P. 205. The city challenged this remedy, arguing that no damages could be awarded in equity cases. Id. at 301, 88 P. 205. Citing a large number of cases from Washington and other jurisdictions, this court approved of a liability rule as a possible remedy in equity and affirmed the trial court. See id. at 303, 88 P. 205.
¶ 12 We next applied the liability rule concept in ejectment cases. In Bufford, 90 Wash. at 205, 155 P. 1068, the encroachers were mistakenly shown a bank-owned lot instead of their own, and so constructed their home entirely on the bank's lot. Both the bank and the encroachers paid taxes on their titles of record until the mistake was discovered and the bank sued for ejectment. Id. This court held that, although the encroachers' possession did not give rise to a claim for adverse possession, the bank was not entitled to eject them. Id. at 206-09, 155 P. 1068. Under the maxim that a party requesting equity must do equity, the encroachers could remain on the land, but had to deed their identical parcel to the bank in exchange for this privilege, or, if the bank preferred, reimburse the bank for any taxes it paid on the lot the encroachers had been occupying. Id. at 208-09, 155 P. 1068. Thus, as in Hart, we applied a liability rule requiring one party to yield its absolute right to the other party in exchange for a penalty.
¶ 13 As with any change in bedrock property law, the introduction of liability rules was controversial. In Tyree v. Gosa, 11 Wash.2d 572, 573-77, 119 P.2d 926 (1941), some encroachers relied on a surveying mistake when building their homes even though the plaintiff warned them that they were trespassing on his land. The trial court refused to eject the encroachers, but required them to pay the plaintiff in exchange for the land. We found this remedy unauthorized. Id. at 580, 119 P.2d 926. Ignoring Bufford, we stated that the parties had cited no Washington case that allowed such "balancing the equities," implying that none existed in our jurisprudence. See id. We further noted that the trial court's remedy, even if authorized, amounted to an unconstitutional taking of property for private use. Id. at 580-82, 119 P.2d 926. Similarly, in Adamec v. McCray, 63 Wash.2d 217, 219-20, 386 P.2d 427 (1963), we repeated Tyree's statement that no Washington cases supported the application of a liability rule to an encroachment. In both Adamec and Tyree, we opined that other jurisdictions had applied liability rules only to encroachments of a few inches, and so the remedy did not apply to greater encroachments. See id.; Tyree, 11 Wash.2d at 580, 119 P.2d 926.
¶ 14 Adamec and Tyree called into question the propriety of substituting a liability rule for the traditional property rule in encroachment cases. Reading them without reference to Hart and Bufford, which they did not address, gave the impression that liability rules might be impermissible, or permissible only in very limited circumstances.
*1121 ¶ 15 We ultimately recognized the discrepancy in our case law and settled the point in Arnold. In that case, the Arnolds' house and fence encroached over the Melanis' property line because of a surveying mistake. Arnold, 75 Wash.2d at 145-46, 449 P.2d 800, 450 P.2d 815. The trial court held that it would be inequitable to require the Arnolds to remove their house, which was worth far more than the area encroached. It granted them the right to remain in their house on condition that they pay the Melanis for the value of the encroached land. Id. Surveying Adamec, Hart, Bufford, and Tyree, we upheld the trial court's equitable remedy. Id. at 149-53, 449 P.2d 800, 450 P.2d 815. We explained that Adamec did not need to address the legitimacy of recognizing a liability rule remedy because of the facts of that case. Id. at 149-50, 449 P.2d 800, 450 P.2d 815. We distinguished Hart, but noted its use of a liability rule. Id. at 150, 449 P.2d 800, 450 P.2d 815. We approved of Bufford's equitable use of a liability rule in cases of good-faith mistake. Id. Tyree we explained in light of its unique factsthe encroachers had notice that they might be building on another's land and took that risk when buildingand dismissed its purported constitutional holding as dictum.[5]Id. at 150-52, 449 P.2d 800, 450 P.2d 815. Finally, we distilled our cases into a test for when a court may substitute a liability rule for the traditional property rule in encroachment cases:
[A] mandatory injunction can be withheld as oppressive when, as here, it appears ... that: (1) The encroacher did not simply take a calculated risk, act in bad faith, or negligently, willfully or indifferently locate the encroaching structure; (2) the damage to the landowner was slight and the benefit of removal equally small; (3) there was ample remaining room for a structure suitable for the area and no real limitation on the property's future use; (4) it is impractical to move the structure as built; and (5) there is an enormous disparity in resulting hardships.
Id. at 152, 449 P.2d 800, 450 P.2d 815.
¶ 16 Our opinion in Arnold grounds this test in the general power of the court to afford equitable relief. "`[E]quity has a right to step in and prevent the enforcement of a legal right whenever such an enforcement would be inequitable.'" Id. (quoting Thisius v. Sealander, 26 Wash.2d 810, 818, 175 P.2d 619 (1946)); accord Casa del Rey v. Hart, 110 Wash.2d 65, 71, 750 P.2d 261 (1988); In re Estates of Palmer, 146 Wash. App. 132, 137 n. 7, 189 P.3d 230 (2008). Importantly, we explained Arnold's test as something more than merely balancing the equities. 75 Wash.2d at 152-53, 449 P.2d 800, 450 P.2d 815. Rather, it is concerned with the reasoned use of injunctive relief only when an absolute property rule is appropriate. See id. at 153, 449 P.2d 800, 450 P.2d 815 ("It is a contradiction of terms to adhere to a rule which requires a court of equity to act oppressively or inequitably and by rote rather than through reason."). The dissenters complained that a court should always enforce landowners' legal rights even if doing so is inequitable, and would have stopped short of allowing a court to alter property rules through its equity power. See id. at 154-55, 449 P.2d 800, 450 P.2d 815 (Hill, J., dissenting). But, the majority relied on Bufford and Hart, which fashioned liability rules instead of property rules, and disapproved of dicta in Adamec and Tyree, which purported to limit or eliminate a court's ability to do so. Thus, the majority's holding confirmed that a court's equity power transcends the mechanical application of property rules. See id. at 152, 449 P.2d 800, 450 P.2d 815.
¶ 17 Proctor acknowledges Arnold's holding that a court may refuse to enjoin an encroachment under certain circumstances but argues that appropriate circumstances are not present in this case. Specifically, he contends that Arnold does not permit a court to deny an injunction unless the damage to the landowner is "slight."[6]See Arnold, 75 *1122 Wash.2d at 152, 449 P.2d 800, 450 P.2d 815 (part 2 of the test). The Huntingtons put their house, garage, and well on Proctor's land, occupying a full acre. Proctor argues that encroachment of an entire acre of land, worth $25,000, cannot be "slight" in any sense of the word. He points to cases addressing much smaller encroachments in an attempt to show that the remedy in Arnold is not available here. See id. at 145, 449 P.2d 800, 450 P.2d 815 (2 × 3.28-foot encroachment); Hanson v. Estell, 100 Wash.App. 281, 283, 997 P.2d 426 (2000) (1-foot encroachment); Mahon v. Haas, 2 Wash.App. 560, 563, 468 P.2d 713 (1970) (15-foot strip); see also Adamec, 63 Wash.2d at 219-20, 386 P.2d 427 (doctrine applies only to encroachments of "a few inches"); Tyree, 11 Wash.2d at 580, 119 P.2d 926 (same). But see Bach v. Sarich, 74 Wash.2d 575, 578, 582, 445 P.2d 648 (1968) (considering but rejecting a "balancing the equities" argument for a 130 × 77-foot encroachment).
¶ 18 It may be true that encroachments of only a few feet are more likely to meet the Arnold test than greater encroachments. However, Arnold relied on and derived its rule from Bufford, in which the encroachers occupied the landowner's entire parcel. Arnold, 75 Wash.2d at 150, 449 P.2d 800, 450 P.2d 815. In absolute terms, this encroachment was sizeable, and in comparative terms, this encroachment was much greater than the one in this case. The acre on which the Huntingtons built makes up only about 3.3 percent of Proctor's parcel. Since Bufford was a case on which Arnold based its test, encroachments on par with the one in Bufford may be said to fall within the meaning of "slight" in appropriate circumstances.
¶ 19 Proctor tries to distinguish Bufford on the ground that the landowner in that case made no claim to its lot until after the 10-year adverse possession period had run, and so it would have been inequitable to eject the encroachers. Suppl. Br. of Pet'r at 15. Here, in contrast, Proctor sued for ejectment before the adverse possession period had run. Id. This distinction misses the point. Bufford held that the encroachers could not acquire title by adverse possession because the first few years of their possession had not been open and notorious. 90 Wash. at 206-08, 155 P. 1068. It then proceeded on equitable grounds to deny the landowner's request to eject the encroachers. Id. at 208-09, 155 P. 1068. Likewise, the Huntingtons' claim for adverse possession failed. Thus, as in Bufford and Arnold, the trial court appropriately turned to equitable considerations to determine whether an injunction should issue.[7]
¶ 20 Proctor argues for a hard and fast rule that unless an encroachment is "slight" in an absolute sense, a court must always grant an injunction to eject the encroacher. But, our case law affords a trial court greater flexibility. The entire purpose of our pronouncement in Arnold was to show that injunctions should not mechanically follow from any encroachment. See Arnold, 75 Wash.2d at 152, 449 P.2d 800, 450 P.2d 815 ("Ordinarily,... a mandatory injunction will issue to compel the removal of an encroaching structure. However, it is not to be issued as a matter of course .... [T]he court must grant equity in a meaningful manner, not blindly." (emphasis added)). A court asked to eject an encroacher must instead reason through the Arnold elements as part of its duty to achieve fairness between the parties. See Young v. Young, 164 Wash.2d 477, 488, 191 P.3d 1258 (2008) (discussing a court's "tremendous discretion" to do justice when fashioning an equitable remedy). This is the essence of the court's equity power, which is inherently flexible and fact-specific. See id. at 495, 191 P.3d 1258 ("[F]lexibility is crucial in fashioning remedies that do equity to the parties.").[8]
*1123 ¶ 21 Here, although encroachment on an acre of Proctor's land (worth $25,000) was not "slight" in an absolute sense, that was not the key question before the trial court. The question was whether, in equity, it would be fair and just to require the Huntingtons to remove their entire house, garage, and wellat an estimated cost of over $300,000 because of both parties' good-faith surveying mistake. The benefit of removal to Proctor would be to gain an acre. (As for the house, Proctor admitted he did not know what he would do with it, seeing as he had built his own house shortly after the Huntingtons' house was constructed. RP at 810; CP at 404.) The acre of land would not appreciably increase the value or size of Proctor's parcel, which totals 30 acres.[9] On these particular facts, the trial court could fairly characterize the benefit to Proctor as minimal. In contrast, ejectment would impose a great hardship on the Huntingtons because they would have to remove and reconstruct their house and garage and drill a new well. (The loss of one acre of land itself would not impose hardship on the Huntingtons, as they also owned much more than one acre.) The trial court's equitable approach in this case fits comfortably within the good-faith-mistake line of cases, including Arnold and Bufford, in which equity allows a court to apply a liability rule in lieu of rote application of a property rule. Because the trial court's chosen remedy was proper under Bufford and Arnold, the Court of Appeals was right to affirm it.

CONCLUSION
¶ 22 In upholding the equitable remedy imposed by the trial court, we recognize the evolution of property law in Washington away from rigid adherence to an injunction rule and toward a more reasoned, flexible approach. Nothing in our holding today undermines fundamental property rights: it remains true that a landowner may generally obtain an injunction to eject trespassers. Proctor does not forfeit the right to his land, nor do the Huntingtons get something for nothing. Consistent with our case law, the trial court's remedy requires the Huntingtons to pay Proctor fair market value for the land upon which they unwittingly encroached. This is exactly the sort of analysis that our precedent prescribes. We affirm the Court of Appeals.
WE CONCUR: CHARLES W. JOHNSON, TOM CHAMBERS, SUSAN OWENS, and MARY E. FAIRHURST, Justices.
SANDERS, J. (dissenting).
¶ 23 I disagree with the majority on a fundamental level. The disagreement can be simply put: the majority views the test in Arnold v. Melani[1] as a balance of equities. It is not.
¶ 24 It is incorrect to view Arnold, 75 Wash.2d 143, 449 P.2d 800, 450 P.2d 815, solely as a balance of equities because the Arnold test is, first and foremost, a gatekeeper. It is a checklist of five requirements wherein each must be satisfied by clear and convincing evidence before a trial court can grant the "exceptional relief" of refusing to enforce a private citizen's property rights for the benefit of another private citizen. Only one requirement of the test incorporates a balance of equities, tilted in favor of the lawful landowner: the court must determine whether the encroacher has shown, by clear and convincing evidence, that "there is an enormous disparity in resulting hardships." Id. at 152, 449 P.2d 800, 450 P.2d 815 (emphasis *1124 added). The other four requirements are completely independent of any balance of equities or even any comparison between the encroacher and the landowner. Id. The first addresses characteristics of the encroacher; the second and third address effects on the lawful landowner; and the fourth considers whether it is practical to move the encroachment. Id.
¶ 25 Arnold permits a court to refuse to enforce a lawful property owner's private property rights"exceptional relief for the exceptional case"only when its five requirements are met. Id. The majority views Arnold as if it were a flood of equity, and thereby drowns the protection of property rights in the process. The Arnold court was mindful of equity, but Arnold is not an all-access equity pass. It formulates a narrow exception to the rule that property rights are enforced. Arnold's first allegiance is to "the protection of the concept of private property" as a "`sacred' right [that] exists in a free society." Id.
¶ 26 The Arnold court was not bashful in its protection of private property rights. An encroacher must prove each of the five requirements by clear and convincing evidence:
(1) The encroacher did not simply take a calculated risk, act in bad faith, or negligently, willfully or indifferently locate the encroaching structure; (2) the damage to the landowner was slight and the benefit of removal equally small; (3) there was ample remaining room for a structure suitable for the area and no real limitation on the property's future use; (4) it is impractical to move the structure as built; and (5) there is an enormous disparity in resulting hardships.
Id.
¶ 27 Here, Robert and Christine Huntington did not, and cannot, prove the second and third requirements by clear and convincing evidence. The trial court erred by refusing to enforce Proctor's property rights.

Second Arnold requirement
¶ 28 The Huntingtons failed to prove the second requirement by clear and convincing evidence: "the damage to the landowner was slight and the benefit of removal equally small." Id. Whether we turn to case law or common sense, Proctor lost an entire acre of land. The loss of one acre43,560 square feetis not "slight," nor would the benefit of its return be equally small.
¶ 29 Previous decisions measured "slight" losses in inches or a few feetnot 43,560 square feet. See Arnold, 75 Wash.2d at 145, 449 P.2d 800, 450 P.2d 815 (an encroachment of 10 feet); Hanson v. Estell, 100 Wash.App. 281, 288-89, 997 P.2d 426 (2000) (a barn encroached upon one foot of property); Holmes Harbor Water Co. v. Page, 8 Wash. App. 600, 601-02, 508 P.2d 628 (1973) (a house exceeded the maximum height under a restrictive covenant by 4 inches to 2.6 feet); cf. Adamec v. McCray, 63 Wash.2d 217, 219-20, 386 P.2d 427 (1963) (rejecting a balance of equities but noting that cases where the doctrine is applied deal with encroachments of "a few inches").
¶ 30 And that conforms to both common sense and the English language. "Slight" is "small of its kind or in amount: scanty, meager" and "something (as an amount, quantity, or matter) that is slight or insignificant." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2142 (2002). A court might reasonably pronounce that the loss of a few inches or feet of property is insignificant. The landowner will suffer no more than slight damage from being unable to tread upon, build upon, or otherwise enjoy a few extra inches of land. Furthermore, the landowner is unlikely to benefit from return of a few inches or feet of property; the return will not affect how the landowner uses his or her land or what the landowner does on his or her property.
¶ 31 But an acre could provide the site for an entire homestead, as it did here. And Proctor need not develop the property to suffer its loss or benefit from its return. Whereas the damage is slight if Proctor couldn't build, hike, hunt, or bird watch on a few additional inches of property, the loss of an entire acre of property is readily noticeable. Furthermore, the acre in question here is an elevated piece of property with a commanding view of the surrounding areaa view to which Proctor no longer has access.
*1125 ¶ 32 Because neither the loss of one acre nor the benefit from regaining it is "slight," the trial court lacked the legal authority to take Proctor's land for the Huntingtons' benefit. The resolution of this case under Arnold is, or rather should have been, as simple as that.
¶ 33 The majority makes various attempts to circumvent this rather obvious observation. None of its attempts is consistent with Arnold nor do they pay any respect to the substantial protections the law previously afforded private property rights. The majority erroneously melts the second requirement, permitting only slight damage to the landowner, with the fifth requirement, which balances equities. It holds Proctor's loss is slight and the corresponding benefit from return of the acre equally slight compared to the Huntingtons' loss if they are forced to vacate Proctor's acre of land. Majority at 1123.
¶ 34 But determining whether the Huntingtons' loss is "enormous" compared to Proctor's loss is the fifth requirement of the Arnold test. See 75 Wash.2d at 152, 449 P.2d 800, 450 P.2d 815. The majority renders the second requirement redundant, fashioning it into a second balance of equities. It emphatically is not. The second requirement makes no reference whatsoever to equity or the losses of the encroacher. The second requirement is purely a question of the landowner's loss and must be proved individually by clear and convincing evidence. See id.
¶ 35 This requirement is a fundamental check on the danger posed by permitting courts to refuse to enforce property rights. Refusing to enforce a landowner's property rights when he or she stood to suffer the loss of only a few inches or feet of property is still an erosion of those rights, but a slight erosion permitted to avoid gross inequity. Refusing to enforce a landowner's right to an entire acre of land is not mere erosion; it is a judicial taking of property for private benefit. Arnold understood this slippery slope and protected against it; the majority's rewriting, and effective overruling, of Arnold slides right down that slope.
¶ 36 The majority then attempts to sidestep the second half of the second Arnold requirement, asserting Proctor would gain only slight benefit from having his acre returned because one acre would not "appreciably increase the value or size" of his remaining 29-acre parcel. Majority at 1123. I confess I do not entirely understand this argument. "Appreciable" means "[c]apable of being measured or perceived." BLACK'S LAW DICTIONARY 117 (9th ed. 2009). Returning one acre to Proctor would increase the size of his parcel by over three percent and its value by at least $25,000. Is that appreciable? Yes, by definition. Is it "slight"? We should all be so lucky for the return of $25,000 worth of property to be only a slight benefit. But if that is the majority's rationale, that Proctor has enough land or money already and thus $25,000 is slight to him, I find no legal support in Arnold or our case law generally to label a landowner's loss "slight" because he or she is rich. The majority's attempt to "Robin Hood" Proctor because he owns another 29 acres is outside the law.[2]
¶ 37 Perhaps the majority is unconcerned with Proctor's loss of an entire acre because he is being paid $25,000 for itthe court-determined fair market value. But that is not a valid consideration under Arnold. The court always requires the encroacher to compensate the lawful landowner for his or her lost property if that property is not returned under Arnold. If that compensation balances out the property loss and renders the loss or benefit from regaining the property slight, the entire second Arnold requirement will always be satisfied and is therefore pointless.
¶ 38 The majority's approach is also inconsistent with the nature of private property. A fundamental aspect of private property is the landowner's right to choose if he or she will sell the property and, if so, for how much. The majority cannot simply stroll through Sherwood Forest, redistribute property, *1126 and say any harm is slight if the victims are paid what the court determines is fair market value. If Proctor really valued his property only at the market value, he would have sold it already.
¶ 39 Moreover, money is not the real issue here. Land is unique, impossible to duplicate, and unable to be ubiquitously substituted for money. Crafts v. Pitts, 161 Wash.2d 16, 25-26, 162 P.3d 382 (2007). Proctor owns that specific one acre of property and, with it, the right not to sell it for $25,000 or any amount. A landowner is permitted to value his or her land independently of monetary compensation. If the majority insists on ignoring the market value of Proctor's loss when considering whether it is slight under Arnold, it should at least consider Proctor's loss of the value he places on the land.
¶ 40 The nonmonetary value Proctor places on his property is evident in the record. Proctor purchased his land as a quiet, secluded living environment. With the Huntingtons' home on that specific acre of Proctor's property, they are close enough to Proctor's home that he hears their dogs barking, children making noise, and the traffic to and from their home.[3] In the majority's one-sided balance of equities, it discusses the Huntingtons' losses at length, but makes no attempt to consider the full extent of Proctor's losses. Perhaps the majority should consider the obvious: if Proctor truly does not value this one acreif the benefit of its return would be only "slight"why would he bother to file a lawsuit and then appeal the issue all the way to the Washington Supreme Court to get that one acre back?
¶ 41 Regardless of whether the majority views Proctor's loss as the objective or subjective value of the encroached property, that loss isn't slight and the benefit of its return is not equally slight. See Arnold, 75 Wash.2d at 152, 449 P.2d 800, 450 P.2d 815. The Huntingtons did not, and cannot, satisfy the second requirementthat Proctor's loss and the benefit from the acre's return is slight. Arnold does not permit the court to take Proctor's one acre of land.

Peoples Savings Bank v. Bufford[4]
¶ 42 What other wrecking ball can the majority find to smash through the barriers Arnold established to protect private property rights in Washington? The majority digs up a relic of a case from 1916, addressed briefly in Arnold, 75 Wash.2d at 150, 152, 449 P.2d 800, 450 P.2d 815. See majority at 1122. But Peoples Savings Bank v. Bufford, the feeble champion and sole justification of the majority's position that an entire acre of land can be "slight" under Arnold, cannot bear the weight of the majority's desperate wishes. See 90 Wash. at 208-09, 155 P. 1068.
¶ 43 There, Bufford bought one city lot in a row of identical lots in Seattle, but built his house on the wrong lot by mistake. Id. at 204-05, 155 P. 1068. Peoples Savings Bank owned the lot upon which he built his house and offered to resolve the matter by swapping the bank's deed for that property for Bufford's deed to a vacant, but otherwise identical, lot. Id. at 208, 155 P. 1068. Bufford refused, instead hoping to keep the lot to which he already held title and to obtain the bank's lot for free by adverse possession. See id. at 206-08, 155 P. 1068. That didn't *1127 work. See id. The court resolved the matter by letting the bank have its proposed deed swap. Id. at 209, 155 P. 1068.
¶ 44 Now let us be perfectly clear on this. Bufford is a six-page opinion from 1916, almost entirely about adverse possession, that devotes only one paragraph to a vague discussion of "equitable relief." Here it is:
Both parties have asked for equitable relief. Each of them have asked that their title be quieted in lot five in block ten. At the beginning of the trial, appellant [Peoples Savings Bank] offered to make a deed to respondents [Bufford] for lot five in block ten in consideration of a deed to lot five in block seven. The first maxim in equity is: He who seeks equity must do equity. Considering that each party was acting in entire good faith, and each party has paid taxes upon their record titles during all these years; and that no claim was made to both lots by respondents until after the ten-year period after the first possession had run, we think it would be inequitable to permit appellant to oust respondents, or to permit respondents to refuse to either deed lot five in block seven or to reimburse appellant for the taxes it has paid upon the lot upon which they have erected their home. Equity will not give respondents more than they could have claimed at law if the mistake had been discovered in time to bring an action of ejectment.
Bufford, 90 Wash. at 208-09, 155 P. 1068.
¶ 45 Bufford is a decision with thin analysis, issued nearly 100 years ago, stemming from very unique facts. It is not, to say the least, the paradigmatic case for the majority to expand and rewrite Arnold. The Arnold court itself cited Bufford for the proposition that considerations of equity and good faith mistakes were appropriate when determining whether a trespasser must be removed from the landowner's property. Arnold, 75 Wash.2d at 150, 449 P.2d 800, 450 P.2d 815 (citing Bufford, 90 Wash. at 209, 155 P. 1068). Arnold then reasoned that Bufford, among other cases, "support[s] the premise that a mandatory injunction can be withheld as oppressive when ... it appears (and we particularly stress), that [the five Arnold requirements are satisfied: (1) encroacher acted in good faith, (2) slight damage to landowner, (3) no real limit on landowner's future use of remaining property, (4) impractical to move encroachment, and (5) the balance of equities enormously favors encroacher]." Id. at 152, 449 P.2d 800, 450 P.2d 815 (emphasis added).
¶ 46 One could read this "support" passage to mean the principles expressed in Bufford support the Arnold analysis. And that is certainly the case. In its brief analysis, Bufford mentions both good faith and equity as grounds upon which it forgoes ejecting Bufford from the Peoples Savings Bank's lot. 90 Wash. at 208, 155 P. 1068. Arnold adopts those as its first and fifth requirements. See Arnold, 75 Wash.2d at 152, 449 P.2d 800, 450 P.2d 815. Thus, Bufford lends doctrinal support to Arnold. See id. This interpretation of "support" is untroubled by the fact that Bufford did not raise, address, or accept the other three requirements set forth in Arnold.
¶ 47 But the majority reads the statement in Arnold, that Bufford "supports" the standard set forth, to mean that if applied, the facts in Bufford would satisfy the five Arnold factors: particularly relevant here is that the landowner suffered only "slight" damage and would receive "slight" benefit upon return of the encroached property. The majority then concludes that because Bufford involved an entire parcel of property, instead of an entire acre of a 30-acre property, the amount of lost property that can constitute "slight" damage to the landowner under the second Arnold requirement is up to and including the landowner's entire property. Majority at 1122.
¶ 48 There are two problems with this extrapolation from Bufford. Bufford didn't apply all five of the Arnold factors. It is irresponsible for the majority to attempt to add meat to the decayed bones of Bufford; the Bufford court did not consider three of the factors nor did it develop an evidentiary record for us to do so now.
¶ 49 But if the majority insists playing Dr. Frankenstein, a resurrected Bufford does not support the majority's claim that Arnold permits a trial court to take Proctor's acre of property. The facts of Bufford are easily *1128 distinguishable. The Bufford court's focus was whether it was equitable for the bank to give up its lot in exchange for an essentially identical lot. 90 Wash. at 208-09, 155 P. 1068. The damage to the bank was "slight" and the benefit of the return of its original lot equally "slight" because the bank would receive one of two essentially identical lots regardless of the outcome. See Arnold, 75 Wash.2d at 152, 449 P.2d 800, 450 P.2d 815. Here, Proctor is not receiving essentially identical land in exchange, but rather the court-determined market value of his property. The difference (and ensuing damage and benefit) is not "slight" and the "remedy" forced on Proctor ignores the uniqueness of land and the inability to substitute it uniformly for money. See Crafts, 161 Wash.2d at 25-26, 162 P.3d 382.
¶ 50 Furthermore, in Bufford the bank suggested the exchange at the beginning of the trial. 90 Wash. at 208, 155 P. 1068. Where the bank expressed that it would accept the deed swap, and assuming the obviousthat the bank would not volunteer to damage itself or sustain unnecessary losses the Bufford court could have reasonably assumed the bank viewed its own damage as "slight." Again, Proctor emphatically states and discusses why his losses are not "slight." Ultimately, Bufford was driven by its unique facts and does not justify the majority's expansion of Arnold.

Third Arnold requirement
¶ 51 The Huntingtons also fail to prove the third Arnold requirement by clear and convincing evidence: "there was ample remaining room for a structure suitable for the area and no real limitation on the property's future use." Arnold, 75 Wash.2d at 152, 449 P.2d 800, 450 P.2d 815. Failure to prove any Arnold requirement precludes the trial court from refusing to enforce Proctor's property rights. Id.
¶ 52 The majority might[5] argue Proctor's remaining 29 acres still permit him to build a house and thus there is "ample remaining room for a structure suitable for the area." However, further consideration highlights the Arnold test was not fashioned to address encroachments over a few inches or feet i.e., those failing the second requirement. The acreage in that areaboth that of Proctors and the Huntingtonsis heavily forested, hilly, and contains some marshland. There are a limited number of areas on which are flat enough to reasonably build a house. Yes, Proctor was able to build his home on a portion of his remaining 29 acres. However, the Huntingtons' one acre encroachment prevented him from building anything on the elevated lookout upon which the Huntingtons' house is located. It also put a "real limitation" on the future use of his property because he is prevented from enjoying a unique, one-acre piece of his propertywhether he ultimately decided to build on that elevated patch of land, or he chose instead to use it for hiking, camping, bird-watching, hunting, or just quiet meditation.
¶ 53 The third requirement makes sense when we address minor encroachments; Proctor would not have any real limitations on using his property if he lost a few feet of that elevated land. His inability to hike, camp, or build part of a structure on those few feet would be of little consequence. It would be no real limitation if, for example, Proctor's hike to that boundary of his property was cut eight inches short.
¶ 54 But now that the majority has stretched permissible encroachments to an entire acre, the third requirement just doesn't fit. It is a "real limitation" on the future use of property if the encroachment occupies a piece of property so large that Proctor loses the potential site for an entire homesteadin an area where not all property is fit for building a home. And the limitations are not simply on development. Proctor is unable to hike an additional acre of his property to enjoy the lookout that acre affords. He is unable to camp there, hunt there, or use the entire acre of land for any other activity he might enjoy.
¶ 55 The third requirement is awkward to apply here because the loss of an entire acre *1129 of land should have already been weeded out by the second Arnold requirement. In any event a similar analysis under the second requirement makes it equally obvious that Proctor has a real limitation placed upon his property's future use when he loses an entire acre of land suitable for development or to be enjoyed in its natural state.

Conclusion
¶ 56 Arnold wrote a narrow exception to Washington's historically ironclad protection of private property rights. Arnold was never a grant of unbridled equity; it was not created as some sort of supercharged judicial eminent domain where courts can transfer property rights from one private citizen to another based upon the court's determination of which party wants or needs it more. A court's authority to judicially take private property from the lawful landowner for the benefit of an encroacher severely erodes the concept of private property rightsand the Arnold court knew it. The bar for an encroacher to obtain land through equity is therefore high: the encroacher must prove, by clear and convincing evidence, each of the five Arnold requirements. An encroacher demonstrating he or she will suffer an enormous hardship if ejected speaks to only one of those requirements.
¶ 57 Or, so it was. The majority extends the balance of equities to all the Arnold requirements; this misreading of Arnold is tantamount to overruling it. And I do not envy the trial courts that will have to apply the majority opinionthe "new Arnold." Whereas Arnold provided five clear, independent requirements, the majority has chopped up those requirements and boiled them together into an indistinguishable equity-sludgeand, to mix metaphors, has knocked down wall upon wall of private property protections in the process.
¶ 58 The moral of this story should be: before you build, especially near a property line, get a survey.
¶ 59 Because the majority effectively overrules Arnold, dissolving Arnold's strong protection of private property rights, I dissent.
WE CONCUR: BARBARA A. MADSEN, Chief Justice, JAMES M. JOHNSON, and GERRY L. ALEXANDER, Justices.
NOTES
[1] Peoples denied having done this, but the trial court, as the finder of fact, believed the Huntingtons' account.
[2] The trial court determined that Proctor's parcel is designated as forest land, which delayed the running of the adverse possession statute of limitations until the Huntingtons completed their improvements to the land. RP at 914-15 (citing RCW 7.28.085). Proctor sued before 10 years had elapsed since the house's construction. Id. The Huntingtons did not carry their burden on the estoppel claim because they proved it by a preponderance, but not by clear and convincing evidence. CP at 405-06. The adverse possession and estoppel claims are not before us on review.
[3] Another issue was whether the Huntingtons could establish a disparity of hardships if they failed to counterclaim for their home's value under the "betterment statute," RCW 7.28.160-.170. Br. of Appellant at 35-37. The Court of Appeals did not address this argument. Proctor v. Huntington, 146 Wash.App. 836, 850-51, 192 P.3d 958 (2008).
[4] See, for example, Suksdorf v. Humphrey, 36 Wash. 1, 3-6, 77 P. 1071 (1904), overruled on other grounds by Chaplin v. Sanders, 100 Wash.2d 853, 861 n. 2, 676 P.2d 431 (1984), in which an encroacher's adverse possession claim failed for lack of "hostility," and the court reversed a judgment in her successors' favor. This reversal allowed the landowner to eject the encroachers despite their having built a house and planted fruit trees on the disputed tract. Id.
[5] We also refuted Tyree's private takings rationale. Arnold, 75 Wash.2d at 150-52, 449 P.2d 800, 450 P.2d 815.
[6] The dispute over the term "slight" in Arnold is distinct from the question of whether an encroachment is so trifling that a court may refuse to remedy it altogether. The latter is dealt with under another doctrine: de minimis non curat lex (i.e., the law does not redress trifles). See Arnold, 75 Wash.2d at 148, 449 P.2d 800, 450 P.2d 815 (rejecting a de minimis claim separately from discussing the equitable limits on traditional property rules).
[7] Proctor also cites Kent v. Holderman, 140 Wash. 353, 354, 248 P. 882 (1926) because it distinguishes Bufford, stating that "with respect to the facts, each case must stand upon its own bottom." But, Kent distinguished Bufford on an unrelated issue. See id. (holding that, unlike in Bufford, the encroachers had established adverse possession).
[8] The same reasoning forecloses Proctor's other argument, that an encroacher cannot establish a disparity of hardships if he or she does not counterclaim under the betterment statute, RCW 7.28.160-.170. The betterment statute predates Bufford and Arnold, so the equitable rule announced in those cases presumably accounts for its existence. See RCW 7.28.160-.170 (enacted in 1903). Arnold disapproves of the rote issuance of a mandatory injunction, whether due to a failure to counterclaim for the value of improvements or upon the mere showing of encroachment. A court sitting in equity may consider one party's failure to pursue all possible legal remedies, but the point is to reason through the Arnold factors in light of all the facts, as part of the equitable consideration of whether an injunction is appropriate.
[9] Considering the size of Proctor's parcel is appropriate. The Arnold test requires courts to consider the loss to the landowner in light of the "remaining room for a structure suitable for the area" and the "limitation on the property's future use." 75 Wash.2d at 152, 449 P.2d 800, 450 P.2d 815.
[1] 75 Wash.2d 143, 449 P.2d 800, 450 P.2d 815 (1968).
[2] Nor is this taking in the true spirit of Robin Hood, who robbed from the rich to give to the poor. Proctor, the former owner of 30 acres, is losing an acre to the Huntingtons, who already own 27 acres.
[3] I find no merit blaming Proctor for the loss of his seclusion because he built his home after the Huntingtons built theirs. First, Proctor chose a building site on his property as he found it. Had he known immediately the Huntingtons built their home on his property, or even built their home without having an official survey conducted first, he may have investigated further and initiated this action prior to building his home and may have even reclaimed that flat, elevated acre of property for his own home. Second, the Huntingtons must prove that Proctor would not receive even slight benefit from having his land returned. See Arnold, 75 Wash.2d at 152, 449 P.2d 800, 450 P.2d 815. Since moving the Huntingtons off Proctor's one acre would lessen, if not entirely remove, the noise, the Huntingtons cannot make such a showing by clear and convincing evidence.

Whether Proctor could have built his house somewhere else on his remaining 29 acres of land is immaterial. But even if it weren't, the record provides that, due to the nature of the terrain (forest, hills, and marsh areas), some if not most of the area is not suitable to build a house. Neither trial court findings nor evidence in the record demonstrates Proctor's property contained any other housing sites comparable to the one he chose; there is no basis now to infer that Proctor has other comparable alternatives.
[4] 90 Wash. 204, 208-09, 155 P. 1068 (1916).
[5] The majority all but ignores the third requirement, referencing it only to attempt to justify its misguided Robin Hood theory under the second requirement. See majority at 1123 n. 9.