IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| MURRAY M. CAMPBELL, JR., | ) | |
| | ) | No. 33977-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RUTH L. DROLLINGER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Ruth Drollinger appeals a civil anti-harassment protection order entered against her, arguing that it was improperly based on constitutionally protected speech and that oral findings on which the trial court based the order were not supported by substantial evidence. Because the order was based on substantial evidence unrelated to protected speech, we affirm.

FACTS AND PROCEDURAL BACKGROUND

On October 1, 2015, Murray Campbell, proceeding pro se, petitioned for an anti-harassment protection order against Ruth Drollinger.[1] He and Ms. Drollinger had been involved in a romantic relationship that ended badly earlier in the year. His petition was heard on December 8, 2015. At the hearing, Mr. Campbell testified to the following events, all of which occurred in 2015, in support of his petition.

- In the first part of June, Ms. Drollinger contacted a female acquaintance of Mr. Campbell to warn her about him. She sent the woman a video recording of what Ms. Drollinger describes as an assault and Mr. Campbell describes as an argument. She also directed the woman to a website, "LiarsCheatersRUs.com," where a posting written in part by Ms. Drollinger described Mr. Campbell's history of affairs and stated he was an "impulsive alcoholic, with a violent streak." Ex. 1, at 9.

- On June 27, Mr. Campbell was contacted by Terry Towner, the secretary of the Yakima Beekeeper's Association, to which Mr. Campbell and Bruce Drollinger, Ms. Drollinger's brother, belonged. Ms. Towner told him Ms. Drollinger had called to ask if Mr. Campbell would be attending the Association's picnic that afternoon at Mr. Drollinger's home because she—though not a member of the Association—planned to

---

[1] Ms. Drollinger's notice of appeal appended materials filed in the proceeding below that were not designated as clerk's papers, including Mr. Campbell's petition and its attached sheriff's reports. We have reviewed those filings in rendering our decision.

attend. On learning of Ms. Drollinger's plans, Mr. Campbell chose to stay away. Ms. Towner later informed him that Ms. Drollinger did come to the picnic and stayed for about 45 minutes.

- On June 29, Ms. Drollinger called Brian Dennis, a coworker of Mr. Campbell's at the Yakima School District. She asked Mr. Dennis whether Mr. Campbell was seeing another woman, told him Mr. Campbell had issues with anger and alcohol, and threatened to reveal court records to the school district. Mr. Campbell assumed the records she threatened to disclose to his employer were from Ms. Drollinger's unsuccessful petition for a domestic violence protection order against Mr. Campbell in May.[2]

- On July 22, at approximately 11:00 p.m., Mr. Campbell saw a white Ford Focus drive down the private driveway he shares with a neighbor. He could not see who the driver was, but knew that Ms. Drollinger's son drove a white Ford Focus. The car turned north at the end of the driveway and then headed west toward the neighbors' property, but "came back within a matter of minutes, stopped at the corner, and then proceeded down the driveway onto the main road." Report of Proceedings (RP) at 13.[3] Mr.

---

[2] Ms. Drollinger appears to seek review of the denial of her petition. But her petition, which was the subject matter of a different proceeding, was denied on May 27, 2015. Ms. Drollinger's notice of this appeal was filed over six months later. Because any appeal of that order is untimely, it will not be addressed further. *See* RAP 5.2 (requiring the filing of a notice within 30 days of the order for which review is sought).

[3] All references to the report of proceedings are to the record of the hearing taking place on December 8.

Campbell called his neighbors to see if the driver had visited them. They said no, and upon learning that Mr. Campbell suspected the driver had been Ms. Drollinger, told him that Ms. Drollinger had contacted them a few days before to inquire whether Mr. Campbell was home. Ms. Drollinger told the neighbors that Mr. Campbell's son said she could stop by Mr. Campbell's home to collect a stock tank belonging to her. Mr. Campbell immediately contacted his son, who denied having talked with Ms. Drollinger.

■ On September 9, Bruce Drollinger contacted Mr. Campbell to see if he wanted a beehive. Mr. Campbell did, and he drove to Mr. Drollinger's home to pick it up. While Mr. Campbell and Mr. Drollinger were loading the beehive into Mr. Campbell's truck, Ms. Drollinger arrived and told Mr. Campbell she had some things for him. She gave him photo albums she had made that included his family and her. She also gave him a pair of sunglasses, saying they were ones he had lost on a trail ride with his daughter to Snow Peak Cabin. It was true that on July 23, Mr. Campbell had taken his daughter for a long weekend horse riding trip to the cabin and that he had lost his sunglasses. Mr. Campbell had stayed at the same cabin with Ms. Drollinger years before and in February 2015, he had reserved the cabin again, for July, with the expectation that Ms. Drollinger would come along. By July Ms. Drollinger was no longer invited, but she remained aware of Mr. Campbell's reservation dates. After handing Mr. Campbell his sunglasses, Ms. Drollinger attempted to continue a conversation with him. He told her he had to go.

4

Mr. Campbell later discovered that Ms. Drollinger posted a request on Facebook on July 22 looking for a trail guide to take her on the trail that leads to the Snow Peak Cabin on the day he and his daughter would be checking out of the cabin. A couple of days later, she included a post on her Facebook page about her ride, stating she had "wanted to relive a ride to Snow Peak Cabin." Ex. 1, at 6.

▪ Finally, on the morning of September 12, 2015, Ms. Drollinger approached Mr. Campbell as he was working in his yard. Asked why she was there, she told him she had brought money to reimburse him for attorney fees he incurred in defending against her petition for a domestic violence protection order against him. She asked if he had a minute to talk, and he said "you have one minute." RP at 28. She began asking questions about whether Mr. Campbell was seeing his daughter's mother again and why he did not go to counseling to save their (Ms. Drollinger and his) relationship. Mr. Campbell told Ms. Drollinger twice to stop, that she needed to leave, and that he would call the sheriff if she did not, but she continued to question him. She finally left when Mr. Campbell pulled out his cell phone and began to phone the sheriff. She left without giving him money to cover his attorney fees.

Sheriff reports attached to Mr. Campbell's petition for the protective order reveal that he had reported Ms. Drollinger's objectionable conduct to the Yakima County Sheriff's Office on June 19, June 26, June 29, July 23, September 9, and September 22. The sheriff's reports indicate that on more than one occasion, Mr. Campbell was advised

that the sheriff would take no action but he could seek an anti-harassment order at the courthouse.

Ms. Drollinger also testified at the December 8 hearing, questioned by her lawyer, who focused on her online activities warning people about Mr. Drollinger. She admitted to having helped write the post on LiarsCheatersRUs.com. She also admitted to visiting the Snow Peak area on July 26 but stated she went with a male friend for reasons unrelated to Mr. Campbell's visit. As for her encounters with Mr. Campbell at her brother's home and in Mr. Campbell's yard, she claimed that on both occasions she was just responding to Mr. Campbell's lawyer's demand that she reimburse Mr. Campbell for the attorney fees he incurred defending against her petition for a protective order.

At the conclusion of the evidence, the trial court orally ruled. It did not regard Ms. Drollinger's call to Ms. Towner about the beekeeper picnic as harassment, because it could be interpreted as an attempt to avoid contact with Mr. Campbell. It found that the remainder of her conduct could reasonably be perceived as "a deliberate attempt to keep [Mr. Drollinger] under surveillance" and was conduct that would cause a reasonable person to be annoyed or concerned about their safety and welfare. It found that Ms. Drollinger intended to frighten, intimidate, or harass Mr. Campbell. RP at 77, 72. It entered a one-year order of protection.

When asked by Ms. Drollinger's lawyer whether the order was based on any of Ms. Drollinger's online posts about Mr. Campbell, the court stated it was not based on

No. 33977-7-III
*Campbell v. Drollinger*

Ms. Drollinger's "blogs," observing that "she has the right to post what she believes, whether it's libelous or slanderous or not, again, is for another Judge and Court to consider. That fact has not been considered by the Court." RP at 76-77. It was her "overall course of conduct in contacts with others" that the court said satisfied it that she intended to annoy and harass Mr. Campbell. *Id.* at 77.

Ms. Drollinger appeals.

## ANALYSIS[4]

Under RCW 10.14.080, a court shall enter a civil anti-harassment protection order if it "finds by a preponderance of the evidence that unlawful harassment exists." RCW 10.14.080(3).

> "Unlawful harassment" means a knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, harasses, or is detrimental to such person, and which serves no legitimate or lawful purpose. The course of conduct shall be such as would cause a reasonable person to suffer substantial emotional distress, and shall actually cause substantial emotional distress to the petitioner.

RCW 10.14.020(2) (emphasis added). "'Course of conduct'" includes communications and contact "but does not include constitutionally protected free speech." RCW 10.14.020(1).

---

[4] No issue is raised on appeal as to whether this case is moot. The anti-harassment protection order has expired by its terms. While a strong argument can be made that it is moot, we decline to dismiss the case on this basis, which was not raised or briefed.

7

The decision to grant or deny a protection order is reviewed for an abuse of discretion. RCW 10.14.080(6); *State v. Noah*, 103 Wn. App. 29, 43, 9 P.3d 858 (2000). "Findings will be upheld on appeal if they are supported by substantial evidence in the record." *In re Marriage of Stewart*, 133 Wn. App. 545, 550, 137 P.3d 25 (2006). "'Substantial evidence' is a quantum of evidence sufficient to persuade a rational fair-minded person that the premise is true." *Proctor v. Huntington*, 146 Wn. App. 836, 845, 192 P.3d 958 (2008), *aff'd*, 169 Wn.2d 491, 238 P.3d 1117 (2010).

Ms. Drollinger's first assignment of error assumes that material she posted online about Mr. Campbell's history of affairs provided support for issuance of the protection order, in violation of her constitutional free speech rights. While Ms. Drollinger's lawyer elicited testimony from Mr. Campbell that her derogatory online statements upset him, that was not the focus of Mr. Campbell's complaints to the court. And when asked, the trial court stated it was not basing the protection order on Ms. Drollinger's online posts because it recognized she had a constitutional right to say such things.

The trial court was focused on Ms. Drollinger's pattern of keeping Mr. Campbell under surveillance, using means calculated to let him know she was not going to leave him, or people close to him, alone. "'[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'" *Cox v. Louisiana*, 379 U.S. 559, 563, 85 S. Ct. 476, 13 L.

8

Ed. 2d 487 (1965) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502, 69 S. Ct. 684, 93 L. Ed. 834 (1948)).

Ms. Drollinger next assigns error to three of the trial court's oral findings, arguing they are not supported by substantial evidence. First, she argues the trial court's finding that she knowingly and willfully attempted to keep Mr. Campbell under surveillance and to harass and annoy him is not supported by the record. She claims she always had legitimate reasons for being where she was and that there is no evidence the white Ford Focus had anything to do with her.

"Circumstantial evidence" refers to evidence from which, based on a fact finder's common sense and experience, he or she may reasonably infer something that is at issue in a case. *DeYoung v. Campbell*, 51 Wn.2d 11, 16, 315 P.2d 629 (1957). The law does not distinguish between direct evidence and circumstantial evidence in terms of their weight or value in finding facts. *State v. Slert*, 186 Wn.2d 869, 879, 383 P.3d 466 (2016). The trial court was not required to accept Ms. Drollinger's explanation of her conduct; intent is typically proved through circumstantial evidence. *State v. Vasquez*, 178 Wn.2d 1, 8, 309 P.3d 318 (2013). As the trial court observed, Ms. Drollinger's repeated run-ins with Mr. Campbell and persons close to him were hard to explain, given their breakup many months earlier, other than as surveillance. The record indicates, for instance, that Snow Peak Cabin, where Ms. Drollinger found Mr. Campbell's sunglasses, is in the Colville National Forest, hundreds of miles away from Yakima. *See* Ex. 1. The

9

credibility, weight, and persuasiveness of the evidence is the trial court's province, not ours. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970, *abrogated in part on other grounds by Crawford v. Wash.*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

Second, Ms. Drollinger argues that Mr. Campbell was never seriously distressed or threatened by her actions. But Mr. Campbell testified several times to his concern. He testified that learning of Ms. Drollinger's trip to Snow Peak Cabin the same weekend he was there upset him. He said it bothered him that Ms. Drollinger wanted to have a "friendly" conversation with him at her brother's house after she had accused him in court of having assaulted her. RP at 36. He testified that when she came to his home on September 12, she tried to reach up and touch his hand, and he pulled back because he didn't want her to touch him. The fact that Mr. Campbell contacted the sheriff on six occasions to complain about Ms. Drollinger's actions supports the fact that her conduct "seriously alarm[ed], annoy[ed], harass[ed], or [was] detrimental to [him]." *See* RCW 10.14.020(2). Substantial evidence supports the trial court's finding that Ms. Drollinger's actions caused Mr. Campbell substantial emotional distress.

Ms. Drollinger next assigns error to the trial court's alleged failure to consider her and Mr. Campbell's relationship and his alleged history of abuse against her and his ex-wife. She points to the court's instruction that she answer yes or no to certain questions, stating it "[didn't] have time for the background." Br. of Appellant at 32 (citing to questioning at RP p. 47). She contends that consideration of the "facts of the

10

relationship" is required by *Hough v. Stockbridge*, 150 Wn.2d 234, 236, 76 P.3d 216 (2003). *Hough* requires consideration of the facts of the parties' relationship only with regard to the trial court's exercise of discretion in determining the appropriate constraints of the protection order. *Id.*

In the portion of the record that Ms. Drollinger cites, the trial court merely instructed her, as courts often admonish witnesses, to answer yes or no to questions calling for yes or no answers. She had responded to such a question with an irrelevant explanation. The trial court allowed Ms. Drollinger's lawyer to question her about her and Mr. Campbell's prior relationship, their breakup, and her online activity accusing him of infidelity and abuse. Both parties were allowed to present relevant evidence.

On a related note, Ms. Drollinger contends the trial court was biased against her because it believed Mr. Campbell over her, failing to recognize that an "abuser may lie about the victim or make up things she did so he can get a criminal case filed against her." Br. of Appellant at 33. The fact that a trial court finds one witness more credible than another does not demonstrate bias. It is the trial court's job as fact finder.

Finally, Ms. Drollinger asserts the trial court cannot be trusted to have come to a fair result because it made mistakes when discussing dates, names, and backgrounds. It appears from our record that the December 8 hearing was the first time the trial court had the opportunity to review and hear any detailed allegations, evidence, or argument about the parties' situation or history. In this sort of hearing, trial courts are generally required

11

to work mostly, if not exclusively, from their own notes. Ms. Drollinger does not identify any prejudicial misunderstanding on the part of the court. *See* RAP 10.3(a) (requiring identification of each error allegedly made, citation to the record, and argument of the issues raised).

Ms. Drollinger fails to show an abuse of discretion by the trial court. We affirm.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

WE CONCUR:

Korsmo, J.

Pennell, J.

12