# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

JUSTIN HELMBRECK,

          Appellant,

       v.

PAULA McPHEE and JOHN DOE
McPHEE, wife and husband and the
marital community composed thereof;
LAURA ELLIOTT and JOHN DOE
ELLIOTT, wife and husband and the
marital community composed thereof;
and the CITY OF DES MOINES,
WASHINGTON, a municipal
corporation,

          Respondents.

No. 79933-9-I

DIVISION ONE

UNPUBLISHED OPINION

APPELWICK, J. — Helmbreck sued Elliott, McPhee, and the City for negligence based on injuries he suffered in a motor vehicle accident in Des Moines. He appeals summary judgment dismissal of his claim against the City and multiple rulings from the trial court on his remaining claims. He argues that the trial court erred in granting the City's motion for summary judgment. He contends that there was evidence indicating the City had constructive notice that the vegetation on McPhee's property constituted a dangerous condition. Alternatively, he argues such evidence was not required. Further, he asserts that the court erred at trial in limiting his cross-examination of McPhee. He also contends that it erred in instructing the jury on his failure to mitigate damages and a property owner's

duty not to create conditions that make an adjacent roadway unsafe for travel. Last, he argues that the court should have granted his motions for a mistrial based on errors during voir dire and opening arguments. We affirm.

FACTS

On June 7, 2015 at approximately 1:00 p.m., Justin Helmbreck was driving eastbound on South 212th Street in Des Moines, approaching the intersection of South 212th Street and 1st Place South. Laura Elliott was driving northbound on 1st Place South, approaching the same intersection. The intersection was not controlled by any traffic lights, stop signs, or yield signs. Helmbreck understood he had a duty to yield to the traffic coming northbound on 1st Place South.

As he approached the intersection, Helmbreck slowed his vehicle and looked north and south for oncoming cars. When he looked to the south, his right, he claimed he could not see down the street due to a hedge. As a result, he drove his vehicle past the hedge and looked to his right again. At that point, he saw Elliott's vehicle and the two collided.

Paula McPhee owns the residence at the southwest corner of South 212th Street and 1st Place South. The foliage that Helmbreck claimed prevented him from seeing down the street is in her yard. According to R. Brandon Carver, the public works director for the city of Des Moines (City), the City had never received a complaint about visibility or road conditions at South 212th Street and 1st Place South prior to Helmbreck's and McPhee's accident. The Des Moines Municipal Code (DMMC) requires property owners of corner lots and reverse corner lots to maintain a triangular area at the corner of their property next to the street in which

2

"no tree, fence, shrub, or other physical obstruction higher than 42 inches above the established grade" is permitted. DMMC 18.190.170. The City had also never received a complaint about a potential violation of this provision before the accident.

In May 2018, Helmbreck sued McPhee, Elliott, and the City for negligence. He alleged that McPhee was "negligent in . . . failing to take reasonable precautions to protect drivers using the adjacent streets from foreseeable harm caused by their failure to remove any landscaping and vegetation that interferes with the sight and views of drivers using the adjacent roadways." He further alleged that Elliott "negligently operated her vehicle when her vehicle" struck his. And, he alleged that the City "was negligent in failing to design, construct and maintain safe roadways at the intersection where the collision occurred." Due to these negligent acts, he claimed that he "sustained serious injuries, disability, emotional distress and pain, loss of enjoyment of life, and other damages." He argued in part that his injuries from the collision required him to have back surgery in December 2016.

In November 2018, the City filed a motion for summary judgment asking the trial court to dismiss all of Helmbreck's claims against it. It argued in part that it had no notice of any visibility hazard. Without (1) evidence of prior actual notice of any hazard or (2) evidence that City employees should have seen the vegetation at issue, it asserted that it could not be held liable for negligence. Helmbreck opposed the motion, implying that the City had constructive notice because the vegetation on McPhee's property existed from 2008 to June 2015. The court

granted the City's motion. Helmbreck then filed a motion for reconsideration, which the court denied. It explained in part,

> The undisputed evidence at the motion for summary judgment was that the vegetation at the McPhee residence changed over time, depending on how quickly the shrubs grew and how often or extensively they were trimmed. There is simply no evidence beyond speculation and conjecture that the City had notice of the allegedly dangerous condition and a reasonable opportunity to correct it before the Helmbreck/McPhee accident.

The case proceeded to trial on Helmbreck's claims against McPhee and Elliott. After voir dire questioning, Helmbreck moved for a mistrial. He argued that the jury became biased against him after the trial court prevented him from asking jurors about the preponderance of the evidence standard. The court denied his motion. Helmbreck moved for another mistrial after opening arguments. He asserted that by "bringing up partying" in their opening arguments, McPhee and Elliott violated the trial court's order on his motion in limine excluding evidence of alcohol consumption. The court denied his motion, but clarified that there should be no use of the word "party" going forward.

Later at trial, McPhee testified that a photo of the vegetation on her property represented what the vegetation looks like in June. During cross-examination, Helmbreck asked her when the photo was taken. She responded that she did not know the year, but that it was taken during the summer months. Helmbreck then asked her if the City came out and "cut the vegetation along South 212th Street" on her property. McPhee objected. She argued that it would be prejudicial to allow evidence of what the City did in response to the accident, and that the response was "a subsequent remedial measure." Helmbreck countered that the photo

4

showed the vines on McPhee's property "after they were trimmed by the City" in 2018, and that she opened the door to his question by introducing the photo. The trial court ruled that Helmbreck could ask McPhee about any changes to the vegetation, but could not ask about any remedial action by the City.

At the close of evidence, Helmbreck objected to several jury instructions. He had proposed an instruction on a property owner's "additional duty to inspect for dangerous conditions." The trial court declined to give that instruction. Over his objection, it instructed the jury that a property owner has a duty only to "exercise ordinary care in connection with the use of the property so as not to make, or create conditions that make, the adjacent way unsafe for ordinary travel or to cause injury to persons using the public road." Helmbreck also argued that there was insufficient evidence to support an instruction on his failure to mitigate damages. The court issued a mitigation instruction over his objection.

A jury found that Helmbreck suffered $29,000.00 in damages. It further found that he was 85 percent at fault for his injuries, Elliott was 15 percent at fault, and McPhee was not at fault. Because Helmbreck declined a $20,000.00 offer of judgment Elliott made before trial, the court awarded Elliott $5,539.07 in costs against Helmbreck. This amount exceeded Helmbreck's trial award against her by $1,189.07. Thus, the court entered a $1,189.07 judgment for Elliott. The court also found that McPhee was entitled to judgment with prejudice and costs against

Helmbreck. It ordered that judgment be entered for her in the amount of $2,301.28.[1]

Helmbreck appeals.

## DISCUSSION

Helmbreck makes four main arguments. First, he argues that the trial court erred in granting the City's motion for summary judgment. Second, he argues that the court erred in limiting his cross-examination of McPhee. Third, he argues that the court erred in instructing the jury on his failure to mitigate damages and a property owner's duty not to create conditions that make an adjacent roadway unsafe for travel. Fourth, he argues that the court should have granted his motions for a mistrial based on errors during voir dire and opening arguments.

### I. Summary Judgment Motion

Helmbreck argues first that the trial court erred in granting the City's motion for summary judgment. He asserts that there was evidence indicating the City had constructive notice that the vegetation on McPhee's property constituted a dangerous condition. Alternatively, he argues that such notice was not required because the City had a duty to anticipate a dangerous condition on its street.

---

[1] In McPhee's order of judgment, the judgment summary set out total judgment in the amount of $2,301.28. That amount is crossed out and the amount of $1,963.01 is handwritten next to it. Below McPhee's judgment summary, in the formal order, the trial court ordered judgment in the amount of $2,301.28 be entered against Helmbreck. Neither party assigns error to this discrepancy. As a result, we do not address it here.

We review summary judgment orders de novo. Hadley v. Maxwell, 144 Wn.2d 306, 310-11, 27 P.3d 600 (2001). Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Peterson v. Groves, 111 Wn. App. 306, 310, 44 P.3d 894 (2002). The moving party bears the initial burden of showing that no issue of material fact exists. Young v. Key Pharms., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989).

"A defendant may move for summary judgment by showing that there is an absence of evidence to support the plaintiff's case." Sligar v. Odell, 156 Wn. App. 720, 725, 233 P.3d 914 (2010). If the defendant meets this initial showing, the inquiry then shifts to the plaintiff. Young, 112 Wn.2d at 225. If the plaintiff "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' then the trial court should grant the motion." Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). When considering the evidence, the court draws reasonable inferences in the light most favorable to the nonmoving party. Schaaf v. Highfield, 127 Wn.2d 17, 21, 896 P.2d 665 (1995).

"[M]unicipalities are generally held to the same negligence standards as private parties." Keller v. City of Spokane, 146 Wn.2d 237, 242-43, 44 P.3d 845 (2002). Thus, to bring a negligence claim against the City, Helmbreck must be able to prove "duty, breach, causation, and injury." Cho v. City of Seattle, 185 Wn. App. 10, 16, 341 P.3d 309 (2014). "A government entity has a duty to maintain its roads so that they are reasonably safe for ordinary travel." Nguyen v. City of

Seattle, 179 Wn. App. 155, 164, 317 P.3d 518 (2014). But, this duty is conditional, for it arises only when the government entity has notice of and time to correct the hazard in question. Id. As a result, the City must have (1) notice of a dangerous condition which it did not create and (2) reasonable opportunity to correct it before liability arises for negligence. Id. at 164-65. Notice to the City may be actual or constructive. Id. at 165. "Constructive notice may be inferred from the elapse of time a dangerous condition is permitted to continue." Id.

The City made several arguments in support of its motion for summary judgment. The trial court incorporated its oral ruling into its order granting summary judgment. Helmbreck's motion for reconsideration addressed the issues raised on appeal. Both orders have been appealed. The detailed basis the trial court set out in the denial of that motion is helpful to focus our review. Its order provided,

> The Court's original ruling granting the City's motion for summary judgment was predicated largely on the fact that plaintiff had produced no evidence whatsoever that the City had notice of the allegedly dangerous condition on the McPhee property for the Helmbreck/[Elliott] collision. "Before a municipality may be liable for an unsafe condition it did not create, it must have notice of the condition and a reasonable opportunity to correct it." Millson v. City of Lynden, 174 W[n]. App. 303, 309-10, 298 P.3d 141, 144 (2013) [(citing Wright v. City of Kennewick, 62 W[n].2d 163, 167, 381 P.2d 620 (1963) and [6 Washington Practice: Washington Pattern Jury Instructions: Civil 140.02 [(7th ed. 2019) (WPI)]. See also, [Nguyen] and Laguna v. [State], 146 W[n]. App. 260, 263, 192 P.3d 374 (2008).

> Nothing has changed with the plaintiff's motion for reconsideration. Plaintiff cites to evidence of vegetation control maps created years after the accident in this case, to evidence that accidents occurred at the same intersection after the accident in this case, and to complaints the City received regarding the subject intersection after the accident in this case. The undisputed evidence

8

at the motion for summary judgment was that the vegetation at the McPhee residence changed over time, depending on how quickly the shrubs grew and how often or extensively they were trimmed. There is simply no evidence beyond speculation and conjecture that the City had notice of the allegedly dangerous condition and a reasonable opportunity to correct it before the Helmbreck/[Elliott] accident.

Plaintiff s citations to [Keller] and Owen v. Burlington N. & Santa Fe R.R. Co., 153 W[n.]2d 780, 108 P.3d 1220 (2005) are misplaced, because the dangerous conditions alleged in those cases were inherent in the design and maintenance of the roadway itself. Where the State creates the dangerous condition, no proof of notice is required. Nguyen v. City of Seattle, 179 W[n]. App. at 164 [(]citing Batten v. S. Seattle Water Co., 65 W[n].2d 547, 550-51, 398 P.2d 719 (1965)[)].

In Keller, the alleged danger was in the roadway itself, which was created and/or maintained by the City. To the extent that notice of the dangerous condition had been required, the Supreme Court noted in its opinion that Spokane "conceded that the intersection had problems and that the traffic engineers had watched it for some time." 153 W[n.]2d at 240. The issue before the Supreme Court in *Keller* had nothing to do with notice. It had to do with whether a municipality's duty to maintain its roadways in a reasonably safe manner extended only to persons exercising reasonable care, or whether that duty extended to all persons, including those who were negligent, so long as their acts were foreseeable. Id. at 252.

Likewise, notice was not an issue in [Owen]. In Owen, a car was struck by a high speed train when it stopped along the railway tracks for traffic that was backed up ahead of it at a red traffic light. The Court's opinion noted that the City of Tukwila's public works director had acknowledged a high volume of both vehicle and train traffic (including high speed trains) at this railway crossing, and nearby traffic signals that frequently caused queuing of vehicles over the tracks. There also was an incline on the road for westbound traffic that limited drivers' ability to see the traffic signals or approaching trains. Thus, the allegedly dangerous condition was inherent in the roadway itself: something that the municipality created and/or maintained.

As in [Nguyen], plaintiff here cites no common law, statutory, or regulatory authority requiring a municipality to inspect its street infrastructure as a component of its duty to provide streets that are reasonably safe for ordinary travel. 179 W[n]. App. at 171.

9

Helmbreck relies on Wuthrich v. King County, 185 Wn.2d 19, 366 P.3d 926 (2016), Owen, and Keller to argue that the intersection was inherently dangerous so notice to the City of the dangerous condition was not required. The trial court's ruling correctly notes that Keller and Owen involved dangerous conditions that were inherent in the roadway itself; either created or maintained by the government. That is not the case here. Wuthrich involved a sight line obstruction due to vegetation. There, the Washington Supreme Court reaffirmed that a municipality has a duty to take reasonable steps to remove or correct for hazardous conditions that make a roadway unsafe for ordinary travel, including those created by roadside vegetation. 185 Wn.2d at 27. King County argued in part that Wuthrich failed to establish legal causation because "there were very few prior accidents at the intersection [at issue], so it did not have notice that the blackberry bushes were hazardous." Id. at 29. But, the court explained that to the extent legal causation includes a notice component, it is simply notice of the condition. Id. It noted there was evidence in the record that the blackberry bushes had been there for years and King County knew about them. Id. Thus, it held in part that there were genuine issues of material fact as to whether the County took reasonable steps to remove the hazardous conditions, and whether its actions or omissions proximately caused Wuthrich's injuries.[2] Id. Nothing in the opinion

---

[2] It was disputed whether King County owned the land on which the blackberry bushes at issue were located. Wuthrich, 185 Wn.2d at 25 n.3. As a result, the court did not reach the merits of Wuthrich's argument that King County had an independent duty as a landowner to use and keep its premises in a condition so adjacent public ways were not rendered unsafe for ordinary travel. Id.

suggests that roadside vegetation is a hazardous condition inherent in the roadway.

Helmbreck relies on the concurring opinion in Nguyen to argue that notice to the City was not required. 179 Wn. App. at 174 (Grosse, J., concurring). However, the majority opinion in Nguyen makes clear that actual or constructive notice of a dangerous condition is an element of a negligence claim against a municipality. 179 Wn. App. at 165-66. A plaintiff is not required to prove notice only if the government entity created the unsafe condition either directly through its negligence, or if it was a condition it should have anticipated. Id. And though Wuthrich was decided after Nguyen, it did not purport to overrule Nguyen nor to eliminate a notice requirement central to that case.

As the trial court correctly noted, Helmbreck has provided no authority that the City had a legal duty to inspect the street and inform itself of dangerous conditions. No legal basis has been established for a presumption that the City should have known the vegetation was a dangerous condition.

Helmbreck does not claim the City had actual knowledge of the vegetation it alleges was dangerous. However, he contends that when viewed in favor of the nonmoving party, the evidence indicates "the City had constructive notice" that the intersection at South 212th Street and 1st Place South was dangerous. Helmbreck states, "The evidence in this case is that the McPhee vegetation, including the hedges, bushes and vines, had existed from at least her purchase of the property in 2008 through 2015" when the accident occurred. His expert, Bryan Jorgensen, an Accident Investigatory/Reconstructionist, testified that in 2008 or 2011, "that

11

hedge along both streets, [wa]s cut way back."[3] Jorgensen stated that at that time the intersection "[p]robably" would have looked safe to City employees and most drivers. But, he testified it was his opinion that on the day of the accident, June 7, 2015, the "overgrown vegetation" "obstructed drivers' view of traffic conditions" and created a dangerous condition. Helmbreck also notes that the City cut down a substantial portion of McPhee's vegetation in 2018. But, what the City did three years after the accident has no bearing on what it knew at the time of the accident. We agree with the trial court that the record lacks evidence of notice to the City, actual or constructive, of the alleged dangerous condition of the vegetation on the McPhee property abutting the intersection prior to the accident.

The trial court did not err in granting the City's motion for summary judgment.

## II. Cross-Examination of McPhee

Helmbreck argues that the trial court erred in limiting his cross-examination of McPhee pursuant to ER 407. He contends that McPhee testified a photo of her landscaping taken in 2018 showed the conditions of her landscaping in June 2015. As a result, he states that she opened the door to being "impeached with questions and evidence that the photograph, in fact, shows the conditions of her landscaping after it was cleared and cut back by the City" in 2018.

---

[3] Jorgensen based this testimony on imagery from Google Maps or Google Earth.

We review a trial court's evidentiary rulings for an abuse of discretion. Proctor v. Huntington, 146 Wn. App. 836, 852, 192 P.3d 958 (2008), aff'd, 169 Wn.2d 491, 238 P.3d 1117 (2010). A court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds for untenable reasons. Id. ER 407 provides,

> When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Courts justify the exclusion of subsequent remedial measures because such evidence is not relevant and may discourage development of safety measures. Hyjek v. Anthony Indus., 133 Wn.2d 414, 418, 944 P.2d 1036 (1997).

Contrary to Helmbreck's assertion, McPhee did not testify that the photo of her landscaping showed the conditions of her landscaping in June 2015. Instead, she agreed that the photo was representative of what the vegetation along South 212th Street looks like in June. When Helmbreck asked her what year the photo was taken, she responded that she did not know, but that it was taken during the summer months based on the color of the vegetation.

In preventing Helmbreck from asking McPhee about any subsequent remedial measures taken by the City, the trial court stated, "[W]hat I'll allow are questions to confirm, to confirm that this [photo] is not [from] 2015, this is [from] 2018." Helmbreck then asserted, "If the photograph shows conditions in 2018, I

have the right to ask her questions such as 'How has it changed between 2015 and 2018?'" The court responded,

> But not if there's a subsequent remedial matter that -- you can come in and you can say that it's different from the way I see it in, it's different in the way that it is seen. But as to ER 407, I'm not seeing how you get around that."

It further clarified that Helmbreck could "ask about the changes but not in a remedial way."

Helmbreck later stated that he should be able to question McPhee about the City's action with respect to her property. The court responded, "[I]f I'm balancing the probative value of that question about the danger of potentially unfair prejudice in this case or confusing the jury in some ways, I'm not seeing that that question, the probative value outweighs the danger here."

Helmbreck does not argue that McPhee disputed ownership, control, or the feasibility of precautionary measures regarding the vegetation on her property. Instead, he argues that he had the right to impeach her testimony that the photo showed the conditions of her landscaping in 2015. But, as established above, McPhee never offered such testimony. Thus, Helmbreck fails to show that evidence of subsequent remedial measures taken by the City falls under the exceptions to ER 407.

Helmbreck further contends that the policy underlying ER 407 does not apply here because McPhee "did not take the safety precautions" and those actions were instead "performed by the City." He cites no authority for that proposition. Where no authorities are cited in support of a proposition, we are not

14

required to search out authorities, but may assume that counsel, after diligent search, has found none. DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.3d 193 (1962). Even so, the trial court stated that it did not see how the probative value of questions regarding McPhee's contact with the City would outweigh the danger of unfair prejudice under ER 403. Helmbreck does not address this basis for exclusion. Accordingly, the trial court did not abuse its discretion in limiting Helmbreck's cross-examination of McPhee under ER 403 or 407.

III. Jury Instructions

Helmbreck argues third that the trial court erred in giving jury instructions related to his failure to mitigate damages and a property owner's duty not to create conditions that make an adjacent roadway unsafe for travel.

Jury instructions are generally sufficient if they are supported by the evidence, allow each party to argue its theory of the case, and, when read as a whole, properly inform the trier of fact of the applicable law. Fergen v. Sestero, 182 Wn.2d 794, 803, 346 P.3d 708 (2015). When we review jury instructions, we look to the instructions as a whole to ensure that both parties were allowed to fairly state their case. Rekhter v. Dep't of Soc. & Health Servs., 180 Wn.2d 102, 120, 323 P.3d 1036 (2014).

We review alleged errors of law in a trial court's jury instructions de novo. Fergen, 182 Wn.2d at 803. Absent a legal error, we review a court's decision regarding the specific language in the instruction for an abuse of discretion. In re Det. of Taylor-Rose, 199 Wn. App. 866, 880, 401 P.3d 357 (2017), review denied,

189 Wn.2d 1039, 409 P.3d 1070 (2018). A trial court has broad discretion in determining the wording of jury instructions. Id. It abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. Id.

A. Failure to Mitigate

1. Evidence Supporting Mitigation Instruction

Helmbreck contends that the trial court erred in instructing the jury on his failure to mitigate because there was no evidence to support the instruction. He asserts that Elliott and McPhee provided "no medical testimony or other evidence that any omissions by [him] had aggravated his condition or delayed his recovery."

Helmbreck relies on Fox v. Evans, 127 Wn. App. 300, 111 P.3d 267 (2005), and Hawkins v. Marshall, 92 Wn. App. 38, 962 P.2d 834 (1998). Helmbreck specifically points to this court's statement in Fox that "[a] defendant requesting a failure to mitigate instruction must show that there were alternative treatment options available to the plaintiff and that the plaintiff acted unreasonably in deciding on treatment." 127 Wn. App. at 305. That language flows from the second paragraph of the instruction in WPI 33.02. WPI 33.02 was the instruction given in Fox.[4] 127 Wn. App. at 304 & n.1. After citing WPI 33.02, this court stated that a

---

[4] The second paragraph of WPI 33.02 provides,

In determining whether, in the exercise of ordinary care, a person should have secured or submitted to medical treatment, as contended by (insert name of applicable party), you may consider [the nature of the treatment,] [the probability of success of such treatment,] [the risk involved in such treatment,] [(other factors in evidence),] and all of the surrounding circumstances.

(Some formatting omitted) (alterations in original).

mitigation instruction should be given "if the medical testimony allows the jury to find that a plaintiff's treatment decisions more likely than not adversely affected his or her recovery." Id. at 306. Fox had sued Evans for injuries she suffered in a car accident. Id. at 302. There was expert testimony at trial that Fox would not accept a depression diagnosis and that if she had treated her depression, her condition would improve. Id. at 301. There was also evidence that Fox had discontinued medication and therapy that had alleviated some of her symptoms and improved her condition. Id. Under these circumstances, this court held it was not an abuse of discretion for the trial court to instruct the jury on Fox's failure to mitigate. Id.

In Hawkins, Marshall argued that the trial court erred in refusing to instruct the jury that Hawkins had a duty to mitigate her damages under WPI 33.02. 92 Wn. App. at 47. This court noted that WPI 33.02 should be used when (1) there is evidence creating an issue of fact as to the injured person's failure to exercise ordinary care in receiving or submitting to medical treatment and (2) the evidence permits a segregation of the damages resulting from that failure to exercise ordinary care. Id. While there was evidence at trial that Hawkins failed to follow her doctor's advice, there was not evidence that her omissions aggravated her conditions or delayed recovery. Id. As a result, this court held that the evidence did not create a question of fact on the issue of mitigation. Id. at 47-48.

But, WPI 33.02 is not the instruction at issue in this case. The trial court's failure to mitigate instruction tracked the language in WPI 33.01, at 383:

> A person who is liable for an injury to another is not liable for any damages arising after the original injury that are proximately

17

> caused by failure of the injured person to exercise ordinary care to avoid or minimize such new or increased damage.

> Defendant has the burden to prove Plaintiff's failure to exercise ordinary care and the amount of damages, if any, that would have been minimized or avoided.

In Sutton v. Shufelberger, 31 Wn. App. 579, 582, 643 P.2d 920 (1982), this court held that WPI 33.01 correctly allocates the burden of proof and should be given whenever substantial evidence is presented creating an issue for the jury as to the injured person's duty to mitigate. Helmbreck does not argue that the court should have given the instruction in WPI 33.02 over the instruction in WPI 33.01. Rather, he argues that there was no evidence to support the WPI 33.01 instruction. Because his argument does not involve a legal error in the instruction, we review the giving of the instruction for an abuse of discretion. See Taylor-Rose, 199 Wn. App. at 880. The question is whether there was substantial evidence to support giving the instruction in WPI 33.01.

Helmbreck testified that about an hour after the June 7, 2015 accident, he noticed that his tailbone hurt. He explained that he initially tried to "tough it out." Ten days after the accident, he testified that he went to the gym and "either tried to go play basketball or do some small weight lifting." He stated that he did not have any pain running down his leg at that point. He also stated that after the accident, he was going to the gym about three times a week.

About two months after the accident, in July or August 2015, Helmbreck saw orthopedic doctors regarding pain in his back and legs. He testified that he had developed a pain that ran down his leg at all times. Helmbreck received a magnetic resonance imaging scan (MRI) of his back in August 2015. He

understood that this first MRI showed damage to his disk and a lot of inflammation. Helmbreck's orthopedic doctors told him that he did not need surgery, recommended physical therapy and cortisone shots, and prescribed him prednisone.

In the fall of 2015, Helmbreck started college and played as the quarterback for his fraternity's intramural flag football team. He played only a few games as quarterback due to his pain. In December 2015, he played basketball, but would feel pain if he had to jump a lot or run up and down the court. Over winter break, Helmbreck visited his orthopedic doctors again. They prescribed him two epidural steroid shots, which he received in January 2016 and March 2016. Helmbreck initially felt relief after each shot, but his pain returned. He received another MRI in March 2016. He understood that this second MRI showed a bulge sticking out of his lower vertebrae. At that point, Helmbreck testified that he remembered a doctor telling him he needed to do physical therapy before the doctor would operate on him.

In June 2016, Helmbreck started physical therapy. His physical therapist advised him not to engage in workouts involving his lower body, like squats, or anything that put a lot of weight on his back. Helmbreck testified that he continued playing basketball because he did not believe it put "a load" on his back. At a different point in his testimony, he stated that playing a game of basketball made him feel "like a baseball bat" hit his back. In late June 2016, Helmbreck also worked out his core and upper body at the gym. He stated that he continued physical therapy for the following six months.

19

Helmbreck's pain continued, and in December 2016, he met for the first time with Dr. Farrokh Farrokhi, a neurosurgeon at Virginia Mason Medical Center. Helmbreck told Farrokhi that his back and leg pain was inhibiting his ability to sit for prolonged periods of time, exercise, and play sports. In his examination notes, Farrokhi explained that Helmbreck's two MRIs from August 2015 and March 2016 "showed slight enlargement of the left L5-S1 disk herniation compressing the passing S1 nerve root." Farrokhi noted that there was no urgent need for surgical intervention, but that if Helmbreck had not improved after two years despite conservative measures, "it would be reasonable to consider minimally invasive left L5-S1 hemilaminotomy and diskectomy." Helmbreck opted to undergo the surgery that same month. He testified that Farrokhi ordered one more MRI before his surgery, which showed that his "bulged disk got worse."

Farrokhi later testified at a deposition that

[t]he particular cause of lumbar disc herniation or disc herniations in general can be varied. People can wake up with a disc herniation, or twist and bend or cough or sneeze or get into a car accident or slip and fall or lift weights. So we see a varied history of how people become symptomatic with disc herniations.

He agreed that squats, weightlifting, dead lifts, box jumps, basketball, and running can all cause disc herniations. With regard to when the pain from a lumbar disc herniation usually starts, Farrokhi explained,

Typically after an injury some people feel instant pain from the compression, and then there's about a 3-to-5 day buildup of inflammatory, sort of a chemical irritation of the nerve with the cytokines that are released. So things tend to get worse for a few days and then they plateau for a few weeks and then level off.

20

He also stated that "[i]t would be unlikely if [Helmbreck] had no symptoms for two weeks that the particular day -- that the disc herniation happened that particular day." Post-surgery, Farrokhi provided a letter stating in part, "Based on the patient's reported lack of symptomatology prior to this accident and subsequent symptoms leading to the diagnosis and treatment, I suspect that the accident was causative agent for the difficulties and necessitated subsequent treatment." Notably, Farrokhi did not refer to his examination or surgery as the basis of his opinion. Nor did he state it was more probable than not that the accident caused Helmbreck's disc herniation.

The above medical evidence, combined with Helmbreck's testimony, could allow a jury to conclude that Helmbreck's injury was aggravated by his subsequent actions and activities. Therefore, substantial evidence supports giving the WPI 33.01 mitigation instruction. The trial court did not abuse its discretion in doing so.

2. Juror Confusion Over Instructions Resulting in Inadequate Verdict

Helmbreck argues next that the jury "was clearly confused" by the trial court's mitigation instruction. He points out that during deliberations, the jury submitted the following inquiry: "Does the term 'negligence' refer only to the cause of the collision, or does it apply to behavior after the collision that may have contributed to any injuries? (Or both?)." The court responded by stating, "Please see the instructions. Per Instruction No. 1. You must consider the instructions as a whole."[5]

---

[5] The court afforded all counsel and parties an opportunity to be heard before responding.

In addition to the mitigation instruction, the court had instructed the jury that "[c]ontributory negligence is negligence on the part of a person claiming injury or damage that is a proximate cause of the injury or damage claimed." It further instructed the jury,

> If you find contributory negligence, you must determine the degree of negligence, expressed as a percentage, attributable to the person claiming injury or damage. The court will furnish you a special verdict form for this purpose. Your answers to the questions in the special verdict form will furnish the basis by which the court will apportion damages, if any.

Helmbreck does not take issue with any of the court's negligence instructions. During closing argument, he referred to the instructions and explained how a damages award would be apportioned,

> You're going to be asked in these instructions to assign percentages of fault amongst the three parties. I want you to understand how that percentage works in a legal setting and with compensation. So if you deliberate and you decide [Helmbreck] is 10 percent at fault or 40 percent at fault, or whatever percentage you come up with, the judge will take that percentage, he will multiply it times whatever compensation you come up with. And so what [Helmbreck] would receive is the compensation minus his percentage of contributory fault.

On the verdict form, the jury was asked what it found Helmbreck's amount of damages to be and was instructed not to consider the issue of contributory negligence in its answer. We presume the jury follows the trial court's instructions. Tincani v. Inland Empire Zoological Soc'y, 124 Wn.2d 121, 136, 875 P.2d 621 (1994). The fact that the jury inquired as to whether the term "negligence" applied to behavior after the collision and found Helmbreck 85 percent negligent in causing the accident does not rebut this presumption.

At closing argument, Helmbreck had asserted that "reasonable compensation for the medical treatment and care of the last four years of his pain, disability, [and] loss of enjoyment of life is $250,000." In his trial brief, he stated that he had incurred a total of $35,417.78 in medical expenses. Before allocating fault on the verdict form, the jury found Helmbreck's amount of damages to be $29,000. An unfavorable verdict alone does not persuade us that the jury confused the court's mitigation and contributory negligence instructions. The question posed by the jury intimated that Helmbreck's behavior after the collision contributed to his injury. The testimony of Farrokhi and Helmbreck allowed the jury to conclude that Helmbreck's injury from the accident was far less severe than the injury for which he had surgery. On this record, we cannot say the determination of damages was inadequate as a matter of law.

3. The Verdict Form

Helmbreck points out that the verdict form "provided no place for the jury to address the court's mitigation instruction and its impact on damages." But, the record does not reflect that he objected to the verdict form or requested such information be placed on the form. Nor did he propose a verdict form that addressed mitigation or provided for an itemization of damages. If a party is dissatisfied with a special verdict form, then that party has a duty to propose an appropriate alternative. City of Bellevue v. Raum, 171 Wn. App. 124, 145, 286 P.3d 695 (2012). We may refuse to review any claim of error not raised in the trial court unless the error involved (1) lack of jurisdiction, (2) failure to establish facts upon which relief can be granted, or (3) manifest error affecting a constitutional

right. RAP 2.5(a). Helmbreck fails to establish that his verdict form argument falls under these exceptions. As a result, he did not preserve this alleged error, and we decline to address it on the merits.

B. Property Owner's Negligence

Helmbreck asserts that the trial court's duty instruction failed to address "a property owner's [additional] duty to maintain the landscaping on their property so that the landscaping does not create dangerous conditions for drivers using the adjacent streets." He specifically characterized it as a "duty to inspect for dangerous conditions" and "make such repairs and maintenance which are reasonably necessary to eliminate the dangerous conditions." Because Helmbreck's argument suggests a legal error, we review the instruction de novo. See Fergen, 182 Wn.2d at 803.

The trial court declined to give Helmbreck's proposed instruction on a property owner's alleged duty to inspect for dangerous conditions. Helmbreck's proposed instruction stated,

> An owner of property adjacent to a public street has a duty to exercise reasonable care in connection with the use of the property so as not to make, or create conditions that make, the adjacent way unsafe for ordinary travel or to cause injury to persons using the public street. The duty to exercise[ ] reasonable care includes the duty to maintain the property and keep it in a reasonably safe condition for those persons using the public streets adjacent to the owner's property. The owner of the property must inspect the property for dangerous conditions on the property and make such repair or maintenance or provide such warnings as may be reasonably necessary for the persons traveling on adjacent streets. The duty of reasonable care includes an affirmative duty to discover and remove dangerous conditions.

Over his objection, the court gave the following instruction (instruction 15), which tracked the first sentence in Helmbreck's proposed instruction and the language in WPI 135.01, at 826:

> An owner of property adjacent to a public road has a duty to exercise ordinary care in connection with the use of the property so as not to make, or create conditions that make, the adjacent way unsafe for ordinary travel or to cause injury to persons using the public road.

To support his proposed instruction, Helmbreck relied on Re v. Tenney, 56 Wn. App. 394, 783 P.2d 632 (1989).[6]  In Re, this court examined whether Cargill had a duty to warn travelers on the highway adjacent to its property of the possibility of congestion due to trucks parking on the road's shoulders while waiting to use its grain elevator.  Re, 56 Wn. App. at 395-96.  This court noted that generally, an abutting property owner must use and keep his premises in a condition so adjacent public ways are not rendered unsafe for ordinary travel.  Id. at 396-97.  It stated that this duty arises "when correction of the unsafe condition is within the owner's control."  Id. at 397.  Because Cargill could have corrected the traffic obstruction by using its property as a staging area, this court held that Cargill's duty arose.  Id. at 398.  This court did not address whether property owners have an affirmative duty to inspect their property for dangerous conditions and remove those conditions.

---

[6] Helmbreck also relied on Collais v. Buck & Bowers Oil Co., 175 Wash. 263, 27 P.2d 118 (1933).  That case involved a slip and fall where the evidence suggested that the oil on a sidewalk the respondent slipped on came from the appellant's premises.  Id. at 263-64, 269.  Because Collais does not address a property owner's duty with respect to an adjacent public road, it is not relevant to the issue here.

25

The issue here is not whether McPhee should have inspected her property and discovered the vegetation at issue. It is undisputed that McPhee was aware of the vegetation in her yard. She testified at a deposition that she typically trims the hedges and bushes she can reach on her property every two weeks. And, she would necessarily see the vegetation every time she left her driveway on South 212th Street and turned right onto 1st Place South. Rather, the issue is whether the vegetation caused an unsafe condition on the adjacent roadway. If it did, instruction 15 makes clear that McPhee has a duty with respect to the condition. It provides that she must exercise ordinary care "so as not to make, or create conditions that make, the adjacent way unsafe for ordinary travel or to cause injury to persons using the public road." This instruction is consistent with the duty outlined in Re.

Moreover, instruction 15 allowed Helmbreck to argue his theory of the case. The evidence at trial was that the vegetation was located on McPhee's property, it was installed and maintained by either McPhee or her predecessors in interest, and McPhee regularly worked in her yard to cut back the vegetation. At closing argument, Helmbreck stated in part,

> The evidence . . . has shown that the McPhee landscaping blocked the views of drivers on both adjacent streets. The rule and the law that the judge just gave you is that the property owner has a duty to exercise care so as to not allow any condition on her property that makes the adjoining street unsafe. Again, this is in your instructions, but what it says is a property owner . . . has a duty to exercise care, which is an affirmative duty. [It d]oesn't mean you can just sit back and ignore something or not actually exercise care to try to eliminate a hazard. [She h]as a duty not to allow a condition on her property that makes the adjoining streets unsafe.

26

Because the trial court's duty instruction allowed Helmbreck to fairly state his case, the court did not err in giving the instruction.

IV.    Motions for a Mistrial

Helmbreck argues lastly that the trial court should have granted his motions for a mistrial based on errors during voir dire and opening arguments.  Because the trial court is in the best position to determine the prejudice of circumstances at trial, we review the decision to grant or deny a mistrial for abuse of discretion. State v. Babcock, 145 Wn. App. 157, 163, 185 P.3d 1213 (2008).

The trial court should grant a mistrial "only when nothing the court can say or do would remedy the harm caused by the irregularity, or in other words, when the harmed party has been so prejudiced that only a new trial can remedy the error." Kimball v. Otis Elevator Co., 89 Wn. App. 169, 178, 947 P.2d 1275 (1997). In determining the effect of an irregularity, we examine (1) its seriousness, (2) whether it involved cumulative evidence, and (3) whether the trial court properly instructed the jury to disregard it.  State v. Emery, 174 Wn.2d 741, 765, 278 P.3d 653 (2012).

A. Voir Dire

Helmbreck contends that the trial court erred in denying his first motion for a mistrial after it prevented him from asking the jury how it felt about the preponderance of the evidence standard.  But, he fails to cite the relevant portion of voir dire in the record.  He fails to cite any authority to support that the court erred in limiting his questioning on the matter.  And, he fails to explain how the court's ruling prejudiced him.  RAP 10.3(a)(6) requires a party's brief to include

argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record. As a result, we decline to address this claim.

B. <u>Motion in Limine Regarding Alcohol Consumption</u>

Helmbreck contends that the trial court erred in denying his second motion for a mistrial after Elliott and McPhee stated during opening arguments that Helmbreck was at a party the night before the accident. He asserts that these statements violated the court's order on his motion in limine regarding alcohol consumption.

Helmbreck testified during a deposition that the day before the accident, he and several friends went to a party where alcohol was consumed. Before trial, he filed a motion asking the court to exclude all evidence of alcohol consumption. The court granted his motion as to use of alcohol. It clarified, "So I think you can ask about -- nothing specifically about alcohol the night before: 'I was at a friend's house. I was at a party. I spent the night there. I got up the next morning,' but not 'A party? How much were you partying?'"

During opening arguments, counsel for McPhee stated, "The night before [the collision], Mr. Helmbreck went over to a friend's house, met up with some other friends, then went to a party that night." Helmbreck objected and the court sustained the objection, telling counsel to "tread more carefully on this." Helmbreck then moved for a mistrial, arguing that counsel for both Elliott and

McPhee violated the order on his motion in limine.[7]  The court denied his motion.
It explained,

> I wholeheartedly agree that there should be no reference to alcohol.
> And my intent was that there should be no inference even to the use
> of alcohol.  As I listened to [the recording from the hearing], there
> was at one point where I was asked by [counsel for Elliott] for
> clarification, and I said, you know, I was talking about questions that
> could be asked.  I said, 'I can see no problem with saying that he was
> at a party at a friend's house, that he spent the night there, and then
> he got up the next morning.'  I did talk about saying 'partying' to the
> extent that that could be used in a verb form, and I didn't, that wasn't
> specifically stated there.

The court told counsel not to use the word "party" going forward.

The record makes clear that McPhee's statement referencing a party did not violate the trial court's order.  Helmbreck still argues that this statement was prejudicial to him.  But, he fails to demonstrate how a single reference to a party was so highly prejudicial that only a new trial could remedy the error.  The court acted within its discretion in denying his motion for a mistrial.

We affirm.

_Appelwick, J._

WE CONCUR:

_Chun, J._                    _Andrus, A.C.J._

---

[7] The record does not reflect that Elliott mentioned a party in her opening argument.  Helmbreck also fails to provide a citation to the record to support this statement.